# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 24-cr-258 (JRT/SGE) |
| Plaintiff, | |
| v. | **ORDER and REPORT &** |
| | **RECOMMENDATION** |
| Benjamin Paley, | |
| Defendant. | |

This case is before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with 28 U.S.C. § 636, and upon the Government's Motion for Discovery (Dkt. 22), as well as Defendant Benjamin Paley's Motion to Dismiss Indictment for Failure to State an Offense (Dkt. 28), Motion to Suppress Statements (Dkt. 29), and Motion to Suppress Evidence Obtained by Search and Seizure. (Dkt. 30.) A hearing was held on April 14, 2025. (Dkt. 41.)[1] Assistant United States Attorneys Matthew Ebert and Kristin Gallagher appeared on behalf of the United States of America ("Government"). Attorney Ian S. Birrell appeared on behalf of Defendant, who was present. After the hearing, the parties filed supplemental briefs. (Dkts. 43, 44.) After review

---

[1] At the motions hearing, neither party submitted exhibits nor called a witness to testify. Upon Mr. Paley's request during the hearing the Court permitted him to submit exhibits after the hearing, and received Exhibits 1, 2, and 3 on April 15, 2025. Defendant's Exhibit 1 is a search and seizure warrant for property located on Mendelssohn Avenue. Defendant's Exhibit 2 is a search and seizure warrant for property located on 16th Avenue. Defendant's Exhibit 3 is a search and seizure warrant for property on Shore Drive.

of the briefs, the Court determined that a more fulsome record was required to decide Defendant's Motion to Dismiss and reopened the Pretrial Motions Hearing. (Dkt. 45.)

An additional evidentiary hearing was held on July 18, 2025. (Dkt. 57.) The Government called FBI Special Agent Richard Frank to testify, and the Court received the Government's Demonstrative Exhibits 1-6, and Exhibit 1. Demonstrative Exhibit 1 is a simplistic illustration of a common workstation that connects to and utilizes a switch. Demonstrative Exhibit 2 is an illustration of how a legitimate license key is purchased. Demonstrative Exhibit 3 is screenshot of a prompt display that generates when a user logs onto a switch. Demonstrative Exhibit 4 is a screenshot of a command typed into a switch to show what license keys have already been installed. Demonstrative Exhibit 5 is a screenshot of a command typed into a switch to add a license. Demonstrative Exhibit 6 is a screenshot of a command typed into a switch to show the license that was recently installed. Government's Exhibit 1 is a Brocade document provided to customers with instructions for installing a license key to a switch.

For the reasons stated below, the Government's Motion for Discovery (Dkt. 22) is **GRANTED**. Further, for the reasons discussed herein, the Court recommends that Defendant's Motion to Dismiss Indictment for Failure to State an Offense (Dkt. 28) be **GRANTED**; Motion to Suppress Statements (Dkt. 29) be **DENIED**; Motion to Suppress Evidence Obtained by Search and Seizure (Dkt. 30) be **DENIED**.

## BACKGROUND

On September 25, 2024, Benjamin Paley was charged by a four-count indictment with Conspiracy to Commit Access Device Fraud in violation of 18 U.S.C. §§ 371 and 1029(a)(1) (Count 1), and Access Device Fraud in violation of 18 U.S.C. §§ 1029(a)(1) and (c)(1)(a)(i) (Counts 2-4). (*See generally* Dkt. 1.) The conspiracy charge against Mr. Paley stems from his alleged use and traffic of counterfeit Brocade license keys between 2014 and April 2022. (Dkt. 1 ¶ 11) And the access device fraud charges stem from alleged conduct in 2020. (Dkt. 1 ¶¶ 16, 18, 20.)

On April 5, 2022, a special agent applied for three warrants: one for Mr. Paley's residence on 16th Avenue, one for his Shore Drive office, and one for his Mendelssohn Avenue office. (*See* Def's Exs. 1, 2, and 3.) The special agent provided identical affidavits for each search warrant application, except for the sections detailing Mr. Paley's connection to each premises. The applications for the search warrants sought several items, including computers, storage mediums, and records relating to the creation and sale of counterfeit Brocade license keys. (Def's Ex. 1 at 4-9; Def's Ex. 2 at 4-9; Def's Ex. 3 at 4-9.) The affidavits thoroughly detail a years long investigation into the creation, sale, and purchase of counterfeit license keys which connect to switches maintained by victim technology companies. (*See generally* Def.'s Exs. 1-3.) The affidavits also describe Mr. Paley's involvement through his business GEN8 Services, Inc. and details his communications via email, phone calls, and controlled purchases. (Def's Ex. 1 at 19, 22.) On April 5, 2022, Magistrate Judge Becky R. Thorson issued all three warrants. (*See* Def's

Exs. 1-3.) After the issuance of the warrants and throughout 2022, Mr. Paley engaged in four separate interviews with the Government. (Dkt. 29 at 1-2; Dkt. 38 at 2.)

At the second, evidentiary hearing, FBI Special Agent Richard Frank, provided additional insight into the investigation and the specific technology at issue. (EH Tr. at 7-70.) [2] The testimony and exhibits produced at the hearing established that a "switch" is a physical device[3] that acts "like a traffic control system" for a network by managing data flow between multiple devices, such as computers and printers to "make sure that all of the information is getting to the right place at the right time." (EH Tr. at 7-8; Gov's Dem. Ex. 1.) Switches are assigned serial numbers and have a certain number of ports through which workstation devices are plugged in and connected to the network. (EH Tr. at 11-13.)[4] Switches are bought with standard features, for example, all switches have 24 ports, but only 8 ports are immediately functional after purchasing a switch. (EH Tr. at 12.)

When a switch owner wishes to enable additional functionality, such as additional ports to connect more devices to their network, they must buy a license key. (EH Tr. at 12.) A "license key" is a "long string of alphanumeric complex code" that are unique to each

---

[2] For ease of reference, the April 14, 2025, motion hearing transcript will be cited as "MH Tr." followed by the specific page number where appropriate. The July 18, 2025, evidentiary hearing transcript will be cited as "EH Tr." followed by the page number associated where appropriate. Both hearing transcripts are currently restricted from public access, but no party has requested any redactions, and this Report and Recommendation does not contain any confidential information or personal identifiers.

[3] The Government brought a switch and used it as a demonstrative during the supplemental evidentiary hearing, but did not have it marked or admitted as an exhibit. (Dkt. 57.)

[4] Switches and their features vary, but for the purposes of this Report and Recommendation, the Court discusses the features of the switch presented as a demonstrative at the hearing. (Dkt. 57.)

individual switch and is what unlocks the additional switch functionality. (EH Tr. at 15-16, 24.) The Government contends there is a "correct" process for obtaining the additional switch functionality which involves (1) going to Broadcom's license portal online and creating a "MyBrocade account;" (2) providing the switch's serial number through the "MyBrocade account" portal; (3) identifying the functionality desired such as additional ports unlocked; (4) purchasing that functionality and receiving a transaction key; (5) entering the transaction key into the "MyBrocade account" portal to download the license key; and (6) plugging  a computer into the switch to physically load the license key onto the switch. (EH Tr. at 17-20; Gov's Dem. Exs. 1-6.) Through this purchasing process,[5] Broadcom keeps track of license key purchases through "their portal" by tracking the switch owner's MyBrocade account and corresponding switch's serial number. (EH Tr. at 20-21.)

However, a legitimate switch resale market exists and no "MyBrocade account" must be immediately created after purchasing a used (or new) switch to access the functionalities already installed on the switch.  (EH Tr. at 14-15.) The issue as described by the Government is that once a used switch has been purchased, it may contain a counterfeit license key which would be discovered when the switch stops working or does not receive updates. (EH Tr. at 31.) Or once a used switch is purchased the purchaser then may add a counterfeit license key to the switch without the purchaser having ever created

---

[5] Notably, the license key is a one-time purchase, thus once the license key is installed onto the switch, the additional functionality will remain even after the switch is sold to someone else. (EH Tr. at 21.)

a MyBrocade account. (EH Tr. at 48.) Without the MyBrocade account Brocade cannot push out updates for the switch or track what license keys have been added to a specific switch. (EH Tr. at 31.)

The alleged counterfeit license keys referenced in Mr. Paley's indictment were discovered only when the Government provided the license key and switch serial number to Brocade, and Brocade cross referenced its own "portal" to determine that it had not issued the license key to that switch. (EH Tr. at 48.) In other words, Brocade's portal would not reflect the counterfeit license key entered onto the switch. (EH Tr. at 49-50, 53.) Thus, instead of going through Brocade's intended six step process, a license key can be purchased on E-Bay, for example, and the purchaser can manually enter the license key onto the switch, without ever creating a MyBrocade account or updating Brocade's portal. (EH Tr. at 54-55.)

## ANALYSIS

### I.  Mr. Paley's Motion to Dismiss Indictment (Dkt. 28)

Mr. Paley contends that the indictment should be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) because it does not state an offense. Specifically, Mr. Paley argues the indictment is insufficient because a license key is not an "access device" as defined by § 1029(e)(1), and thus any use of a counterfeit license key does not fall under 18 U.S.C. § 1029(a)(1). Mr. Paley argues that to be an "access device" as defined in § 1029(e)(1), the license key must be a "means of account access" and that here, there was no account accessed within the meaning of the statute.

## A. An "Access Device" Must Access an Account

Mr. Paley is charged with violating Section 1029(a)(1) which provides:

> Whoever—knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices; ... shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

18 U.S.C. § 1029(a)(1). Title 18 U.S.C. § 1029(e)(1) defines an "access device" as,

> any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, *or other means of account access* that can be used...to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

(emphasis added). A "counterfeit access device" is defined as "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." 18 U.S.C. § 1029(e)(2). However, "account" is not defined by the statute. *United States v. Bailey*, 41 F.3d 413, 417 (9th Cir. 1994) ("The statute, unfortunately, does not define "account."). As discussed more below, courts interpreting § 1029(e)(1) have required an access device to be a "means of account access."[6]

---

[6] Although none of the cases the parties cite or the Court has found specifically applied the last antecedent rule, the Court finds its application supports the requirement that an access device be a "means of account access." "The last antecedent rule explains that qualifying words and phrases usually apply only to the words or phrases immediately preceding or following them, and not to others that are more remote." *Bethel v. Darwin Select Ins. Co.*, No. 11-cv-2242 (DSD/FLN), 2012 WL 4372576, at *3 (D. Minn. Sept. 25, 2012), *aff'd*, 735 F.3d 1035 (8th Cir. 2013) (citing *Barnhart v. Thomas,* 540 U.S. 20, 26 (2003)). Thus, read as a whole, "means of account access" would apply to the preceding nouns in § 1029(e)(1). Additionally, "other indicia of meaning" such as the legislative history supports this interpretation. *Id.* (quotation omitted); H.R. Rep. 894, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3689). The parties did not brief the

Here, the parties agree the license key would constitute a "code" as enumerated in 18 U.S.C. § 1029(e)(1). (MH Tr. at 10.) But Mr. Paley contends that the counterfeit license key, which operates as a code to access additional services on the switch, is not a "means of account access" because it does not access an account as required by the statute. Notably, the indictment does not allege any form of an "account" through which the license key functions as a "means of account access." (*See* Dkt. 1.) And although the Government argues that "the indictment need not include the word 'account,' (Dkt. 43 at 5), the Government seems to argue that there is no requirement that an account be accessed where an access device provides access to services and therefore the word "account" need not be in the indictment. (*See* Dkt. 38.) In the alternative, the Government argues, even if the statute requires a counterfeit access device to access an existing account, the license key at issue accesses an "account." (Dkt. 43 at 5.)[7]

The parties concede that whether a counterfeit license key is an "access device" has not been addressed in any reported case. Nevertheless, various federal courts have

---

interpretation of "means of account access" but rather focused on the definition of "account."

[7] Even if the Government's argument that the indictment need not include the word "account" were correct, several cases cited by the parties have dismissed indictments because, as alleged, the device in question was not a "means of account access" regardless of whether "account" was included in the indictment. *See United States v. Jackson*, 484 F. Supp. 2d 572, 576-77 (W.D. Tex. 2006) (dismissing indictment on grounds that airline tickets were not "access devices"); *United States v. Bruce*, 531 F. Supp. 2d 983, 989-90 (N.D. Ill. 2008) (dismissing indictment on grounds that UPC bar codes were not "means of account access to an account"); *United States v. Brady*, 820 F. Supp. 1346, 1359 (D. Utah), (dismissing indictment on grounds that tumbling cellphones did not access an account), *aff'd*, 13 F.3d 334 (10th Cir. 1993).

interpreted the statute and the statute's legislative history to determine whether an alleged device is an "access device." A discussion of these authorities is instructive.

The Fifth Circuit was the first circuit court to apply the statute. In *United States v. Brewer,* 835 F.2d 550, 553 (5th Cir.1987), the defendant "hacked" unassigned long distance telephone service access codes by calling a toll-free number "and trying out various combinations until he found one that the computer would accept as valid" to make a long distance call. *Id.* at 551. The Fifth Circuit found that the defendant's use of "access codes" to place calls which were "charged to unassigned personal access codes" fell within the ambit of the statute based on a practical reading of the language and its legislative history. *Id.* at 552.

In *United States v. McNutt,* the Tenth Circuit found that "cloned" satellite television descramblers did not provide unauthorized "means of account access" under the statute. 908 F.2d 561, 63-64 (10th Cir. 1990). The court explained that despite the obtainment of free satellite television services through descramblers, the company's economic losses were not "monetary losses resulting from discrete transactions reflected in the company's accounting records." *Id.* at 563. Specifically, the Court found that "[u]nlike the unauthorized use of credit cards or long distance telephone access codes, use of cloned descrambler modules does not debit legitimate subscribers' accounts; no additional charges are accrued as a result of the unauthorized use." *Id.* at 563-64. The Tenth Circuit concluded that "nothing in the plain wording, legislative history or judicial interpretation of § 1029" indicates that "Congress intended that statute to apply to anything other than direct accounting losses." *Id.* at 564.

9

The Eighth Circuit applied the statute in *United States v. Taylor*, 945 F.2d 1050 (8th Cir.1991). In *Taylor* a defendant "devised a 'formula'" to determine valid but unassigned American Express credit card account numbers. *Id.* at 1050-51. The Eighth Circuit found that "[t]he method used here falls within section 1029. The unauthorized use of an account number covering a valid, but unassigned account, constitutes an access device by which the fraud was perpetrated." 945 F.2d at 1051. The Eighth Circuit rejected defendant's argument that "he did not employ an 'unauthorized access device' because no account existed, thus, he could not access an account, and that his use of an account number, which was valid according to the American Express Company computer system, did not amount to an unauthorized use." *Id.* at 1051. The court found defendant's argument "cut[] the statute too thinly and that the language of section 1029, 'account number, or other means of account access,' expressly covers the transactions made by the defendant." *Id.* Notably, the Eighth Circuit determined that the accounts existed and were accessed, but were just unassigned, and the card number was used as a means to access the unassigned account.

A few years after *Taylor*, the Tenth Circuit revisited the "means of account access" question in *United States v. Brady,* 13 F.3d 334, 339-40 (10th Cir. 1993). In *Brady*, the Tenth Circuit held that § 1029 does not apply to tumbling cell phones, a means of obtaining phone services similar to the descrambler addressed in *McNutt*. *Id.* Like in *McNutt*, the Tenth Circuit found that the "account" the defendant allegedly accessed was "no more than a list of unmatched telephone calls, which are not billable because they cannot be attributed to a legitimate subscriber's account." *Id.* at 339. The Tenth Circuit explained:

> [I]n order to fall within § 1029's definition of access device, the government must be able to establish access to a valid identifiable account for which a record of debits and credits is created and maintained, and which results in direct accounting losses. We believe that to hold otherwise would turn § 1029 into a general theft statute applicable whenever a company can document a loss through fraud. Such a broad interpretation of § 1029 is neither supported by the language of the statute nor its legislative history.

*Id*. at 340 (citing H.R. Rep. 894, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3689).[8]

In *United States v. Bailey*, the Ninth Circuit agreed with the Tenth Circuit that an "account" needed to be accessed under the statute. 41 F.3d at 417. The court determined that "an account is a contractual relationship that makes possible the provision of goods, services, or money based on payment, or the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record." 41 F.3d at 417. The Ninth Circuit found that tumbling cell phones are captured under the statute because "there unquestionably was a valid, preexisting 'account' between the local and distant carriers." *Id.* at 418. The Ninth Circuit reasoned that:

---

[8] The Government points out that *Brady* was decided before "major revisions to the statute." (Dkt. 44 at 15.) *Brady* and other cases applied a version of § 1029(e)(1) that did not include "electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier" in the specifically enumerated types of access devices. *See* Pub. L. No. 103–414, 108 Stat. 4279 (codified as amended at 18 U.S.C. § 1029(e)(1) (1994)). The amended version of the statute applicable to this case does not alter the definition of account addressed in *McNutt*, *Brady*, *Bailey*, and *Ashe* because the specifically enumerated types of access devices must still be "means of account access." Additionally, cases applying the amended version of the statute also have required access to an account. *See United States v. Abozid,* 257 F.3d 191, 196–97 (2nd Cir. 2001); *Bruce*, 531 F. Supp. 2d at 989; *Jackson*, 484 F. Supp. at 576; *United States v. Edmonson*, 175 F. Supp. 2d 889, 893 (S.D. Miss. 2001), *aff'd*, 57 F. App'x 212 (5th Cir. 2003).

> The statute nowhere implies that the only "account" protected against improper "access" is one maintained by an end consumer. In this case, services were provided by the local carrier to the users of the tumbling phones with the expectation of repayment by the distant carrier. That account was invoked by the MIN. The ever-changing ESN played the role of a password to go along with the MIN, and is therefore a component of the access device. The local carrier received and relied upon those numbers in providing the service, and did so because of the expectation that it would receive payment for those services upon settlement of the account with the distant carrier. Whatever the status of accounts of individual customers, the tumbling phones were intended, and used, fraudulently to access the benefits of the account between the local and distant carriers.

*Id.* However, the Ninth Circuit did not disagree with the Tenth Circuit's *McNutt*

decision. Instead, the Ninth Circuit distinguished *McNutt* explaining that:

> The code numbers used to construct the descramblers were not represented to the broadcasters in an attempt to obtain services on account. Instead, the signal was openly broadcast, and anyone could receive it. In deciding to provide the signal, the broadcaster never relied on any representation of the existence of an account. In effect, it was not the signal that was sold; instead, the descramblers were rented to make that signal useable. In the case of cellular carriers, on the other hand, the sale of "air time" is the primary good sold; cellular carriers frequently have nothing to do with the production or sale of the phones themselves. Contrary to Defendant's arguments, the ESN and MIN are not just part of an after-the-fact billing device; they are part of a system designed to permit access only by those so entitled because of an account.

*Id.* at 418.

The Sixth Circuit in *United States v. Ashe,* 47 F.3d 770, 774 (6th Cir. 1995) agreed

with the Ninth Circuit's decision in *Bailey* and concluded that a "a converted 'tumbling'

cellular telephone" was an access device because it was "capable of accessing cellular

telephone carrier accounts by transmitting counterfeit MIN and ESN signals that permit

illicit 'roamers' to fraudulently obtain free air time." *Id.* at 774. The court noted that

because "preexisting agreements and practices" required reimbursement of air time

12

between carriers, the free riding call was debited to a phone carriers' account. *Id.* Like the Ninth Circuit, the Sixth Circuit distinguished *McNutt* explaining that in *McNutt* there was no account accessed whereas, the access device at issue in *Ashe* extracted value from "fictitious accounts" which were "recorded as debits to fictitious accounts identified by counterfeit account numbers." *Id.* at 774 n.10.

The Second Circuit also agreed with the Ninth Circuit's description that "an account is a contractual relationship that makes possible the provision of goods, services, or money based on payment, or the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record." *United States v. Abozid*, 257 F.3d 191, 195-96 (2d Cir. 2001) (quoting *Bailey*, 41 F.3d at 417.). The court found an airline ticket with a specific account number imprinted "trigger[ed] an obligation on the travel agency's bank account to the airline that will, if the amount owed exceeds the sums in the account and security, lead to an extension of credit by the airline." *Id.* at 195. The court explained that this "credit relationship" between the airline and travel agency constituted "account access" under § 1029 "because [the airline tickets] bear an account number that, when imprinted upon the ticket stock, along with the airline identification code and travel itinerary, accesses services of value provided under a credit relationship between the travel agency and the airlines.*" Id*. The Second Circuit acknowledged the tension between *Bailey* and *McNutt* but decided it did not need to address "this tension because, here, the airlines

provided travel services under a credit account that was accessed by the validated tickets." *Id.* at 197.

### B.  A Brocade License Key Does Not Access an Account and Cannot Be an "Access Device"

Mr. Paley points out that each circuit that has applied § 1029 has acknowledged that an "account" must be accessed, and argues that here, the license keys do not access an account under any circuit's construction of what "account" means. (*See* Dkts. 28, 44.) The Government contends that the license key is an access device under any circuit's interpretation.  (Dkt. 43 at 24.)

The Court agrees that the license key is not an "access device" because it is not a "means of account access" as required under § 1029(e)(1). The testimony of Special Agent Frank established that when a counterfeit license key is manually entered onto a switch using a computer, that license key and additional switch functionality does not correspond to an account because the owner of the switch did not access a MyBrocade account using the switch's serial number. (EH Tr. at 41.) In other words, a counterfeit license key entered onto a switch can go undetected for years because an owner of a new or used switch may never create a MyBrocade account. In fact, Broadcom only discovered counterfeit license keys were being used when a customer from Germany called Broadcom for technical support and Broadcom compared the counterfeit license keys on the German switch to their records on that particular switch. (EH Tr. at 7.)

Similarly, in this case, unknown actors were adding licenses directly to switches with counterfeit license keys without accessing a MyBrocade account, enabling the use of

14

more portals on the physical switch. (EH Tr. 54.)  And Broadcom was unaware of the fraud because the license key is only stored on the switch, "and [they are] not accessing a Brocade account." (EH Tr. 41, 52-54.)

The Government argues that a counterfeit license key accesses an account as discussed in *Taylor* and *Brewer* because Mr. Paley generated a code that "could be verified and used to frequently obtain a thing of value." (Dkt. 43 at 20.) The Government also argues that the counterfeit license key accessed an "account" as defined by *Brady* because it "unlocked services for an identifiable user's account and were traceable to that user using Broadcom's account records for a particular switch." (Dkt. 44 at 21.) The Court disagrees. In both *Taylor* and *Brewer*, there were accounts accessed, not merely the obtainment of something of value. *Taylor*, 945 F.2d at 1050-51; *Brewer*, 835 F.2d at 551-53. Here, the counterfeit license key is not accessing an account that Brocade maintains, and the only loss to Brocade is a loss of profits when a license key is used to further enable the ports of a switch. In contrast, the credit card accounts in *Taylor* existed but were merely unassigned, and the defendant's purchases made from third parties were debited to the unassigned accounts. *Taylor*, 945 F.2d at 1050-51. Moreover, [w]hile obtaining a thing of value is part of the offense, the thing of value must be obtained by accessing an account with an 'access device.'" *Jackson*, 484 F. Supp. at 576.

A person with a counterfeit license key, obtained from eBay, the dark web, or some other private seller need not create nor access a MyBrocade account to gain greater access to the physical switch they possess. The counterfeit license is simply added to the switch and the physical device becomes more useful. Without needing a MyBrocade account there

15

is no identifiable account with a record created or maintained as discussed in *Brady*, 13 F.3d at 339-40, nor any account created by an extension of credit based on a contractual relationship or a record of credits and debits as contemplated by *Bailey,* 41 F.3d at 417. The Government admits as much stating that "[i]nstalling a counterfeit license key allow[s] the user to obtain the benefit of the additional capability without the corresponding account record and payment to Broadcom." (Dkt. 44 at 22.)

Acknowledging that a legitimate switch owner may never create a MyBrocade account, the Government also argues that the switch itself is an "account" because it "record[s] on itself the use of a license key – as evidenced by the 'licenseshow' command." (Dkt. 44 at 22-23; see Gov's Dem. Exs. 3-6.) However, this interpretation is not supported by the case law addressed above nor by Congress's intent in passing the Act. Though it is clear that Congress intended the statute to be broad enough to "deal with abuse of new technologies" *Bailey*, 41 F.3d at 417, "[t]he underlying concern, in passing the legislation, was the unauthorized use of account numbers or access codes *to gain access to bank or credit accounts.*" *Jackson*, 484 F. Supp. at 576. Here, the switch is a physical device, and the license key merely makes the physical device more usable, or in other words, the license key when typed onto the switch does not access an "account" thus the switch cannot itself be an "account."

In sum, the Government has failed to allege an essential element of § 1029(a)(1), because the purported access device – counterfeit license key – is not a means of account access as required by § 1029(e)(1). Consequently, the Indictment (Dkt. 1) does not state an

offense and the Court recommends that Mr. Paley's Motion to Dismiss be granted pursuant to Rule 12(b)(3)(B).

## II. Mr. Paley's Remaining Pretrial Motions

In the event the District Court disagrees with this Court's analysis on Mr. Paley's Motion to Dismiss Indictment for Failure to State an Offense, the Court will now address Mr. Paley's remaining pretrial motions.

### A. Motion to Suppress Statements (Dkt. 29)

Mr. Paley seeks an Order from this Court suppressing "any and all statements he is claimed to have made." (Dkt. 29 at 1.) Rather than arguing that his constitutional rights were violated, Mr. Paley argues that any and all statements he made occurred in the context of plea discussions and are inadmissible under Federal Rule of Civil Procedure 11(f) and Federal Rule of Evidence 410. However, Mr. Paley's motion did not identify specific statements that he wishes to suppress, and no recordings or transcripts of statements were provided at the hearing.

Pursuant to Federal Rule of Civil Procedure 11(f) the "admissibility or inadmissibility of a plea, a plea discussion and any related statement is governed by Federal Rule of Evidence 410." The Government has not yet decided whether it intends to introduce any of Mr. Paley's statements at trial and the admissibility of any statement is not properly before this Court. At the motion hearing on this matter, both parties agreed that a challenge to the admissibility of any of Mr. Paley's statements on the basis they were made in the context of plea discussions should be brought in a motion in limine before the

trial court. Accordingly, the Court recommends that Mr. Paley's Motion to Suppress Statements (Dkt. 29) be denied as moot at this time.

### B. Motion to Suppress Evidence (Dkt. 30)

Mr. Paley moves to suppress "all evidence obtained by search and seizure" made pursuant to a search warrant. (Dkt. 30 at 1.) However, Mr. Paley's motion did not identify specific evidence that he wishes to suppress, and no evidence was identified at the hearing. Rather, Mr. Paley argued that the warrants lacked probable cause. At the hearing Mr. Paley acknowledged that he was not arguing deficient nexus or any alleged omissions. (MH Tr. at 4.) In sum, Mr. Paley merely wants the Court to review the warrants for probable cause.

"A search warrant must be based upon a finding that there is probable cause to believe that evidence of a crime will be found in the place searched." *United States v. Stucky*, No. 24-cr-71 (JRT/ECW), 2024 WL 4199357, at *3 (D. Minn. Sept. 16, 2024). "Probable cause to issue a search warrant exists when an affidavit [or testimony] in support of the warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or evidence of' criminal activity will be found in the particular place to be searched." *United States v. Davis,* 471 F.3d 938, 946 (8th Cir.2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). "Probable cause is determined by the totality of the circumstances . . . ." *Stucky*, 2024 WL 4199357 at *3 (citing *Illinois v. Gates*, 462 U.S. 213, 230–31, 233 (1983)). In other words, "[p]robable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231).

In reviewing the decision to issue a warrant, the court's task "is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed." *Gates*, 462 U.S. at 231 (citation omitted); *see also United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). "[W]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)) (cleaned up).

As noted above, the affidavits for each search warrant are identical, except for the sections detailing Mr. Paley's connection to each premises. (Def's Exs, 1 at 33-37; Def's Ex. 2 at 37-44; Def's Ex. 3 at 37-40.)

### i. Search Warrant for Mendelssohn Avenue Office (Def's Ex. 1)

The Court finds that the application contains sufficient supporting information to establish probable cause that Mr. Paley engaged in the production and sale of counterfeit license keys during the relevant period. First, the investigator provided detailed information about Mr. Paley's business's registration, email communications, and prior interactions with technology companies which own the devices that license keys are used with. Second, the investigator used CS-1 to conduct recorded phone calls which contained discussion of unauthorized license key sales, and two controlled buys (under law enforcement

surveillance) of unauthorized license keys. The affidavit also establishes the following
related to the subject premises:

- A vehicle registered to Mr. Paley was observed by law enforcement parked in front
  of the premises.
- Mr. Paley had offered the premises as a meeting location with CS-1 via WhatsApp
  message.
- CS-1 and Mr. Paley actually met at the premises in a video recorded meeting where
  approximately four computers and purchase orders were observed, and they
  discussed the purchase of unauthorized license keys. (Def.'s Ex. 1 at 35-36.)
- Based on the agent's training and experience businesses involved in information
  technology keep records in either electronic or paper form relating to sales and that
  individuals involved in business activities maintain these records in places such as
  a business office. (*Id.* at 38.)

The totality of the circumstances described in the affidavit establishes probable
cause to believe that Mr. Paley's office on Mendelssohn Avenue would contain evidence
of his production and sale of unauthorized license keys. Therefore, Mr. Paley's motion to
suppress evidence obtained from the Mendelssohn property should be denied.

### ii.  Search Warrant for 16th Avenue Residence

The basis for the issuance of this search warrant was largely the same as the
Mendelssohn warrant, with the following additional information regarding the 16th
Avenue residence:

- Hennepin County residential records obtained by investigators show that Mr. Paley
  is the owner of the residence. (Def's Ex. 2 at 37-38.)
- Phone records obtained by investigators show that the phone number Mr. Paley
  contacted CS-1 from is billed to the residence. (*Id.* at 38.)
- While conducting physical surveillance investigators observed vehicles registered
  to Mr. Paley at the residence, as well as arriving, and departing the residence on
  several occasions. (Def's Ex. 2 at 38, 43-44.)
- A business of which Mr. Paley is listed as the Chief Executive Officer has its
  registered office address as the residence according to Minnesota Secretary of State
  Business records. (*Id.* at 39.)

20

- Emails from CS-1 containing purchase orders for unauthorized license keys listed the residence as the address for Mr. Paley. (*Id.*)
- Based on the agent's training and experience businesses involved in information technology keep records in either electronic or paper form relating to sales and that individuals involved in business activities maintain these records in places such as a business office on computers and laptops. (*Id.* at 46.)

For the same reasons stated above regarding the Mendelssohn property search warrant, *supra*, the Court finds that the application as to the 16th Avenue residence contains sufficient supporting information to establish probable cause that Mr. Paley engaged in the production and sale of license keys. Moreover, the affidavit sets forth sufficient facts from which the issuing judge could find that Mr. Paley resided at the address. Therefore, the Court recommends that Mr. Paley's motion to suppress evidence obtained from the 16th Avenue property be denied.

### iii. Search Warrant for Shore Drive Office

Again, the basis for the issuance of this search warrant was largely the same as the two warrants addressed above, with the following additional information regarding the Shore Drive Office:

- On several different occasions investigators conducting physical surveillance entered the office building and observed a director board displaying "Gen8 Services, Inc." a business that Mr. Paley is listed as the Chief Executive Officer of. (Def's Ex. 3. at 28.)
- Mr. Paley informed CS-1 that he had two offices, one of which was used more as a storage space and where he kept one computer. (*Id.* at 37-40.)
- Financial records obtained by investigators reveal that Mr. Paley through Gen8 Services mailed money yearly to JGM Properties, and JGM properties was listed on the directory placard observed by investigators during physical surveillance (*Id.* at 40.)

For the same reasons discussed above regarding the Mendelssohn and 16th Avenue Properties, the Court finds the application as to the Shore Drive office contains information

that establishes probable cause to believe that Mr. Paley's office on Shore Drive would contain evidence of his production and sale of unauthorized license keys.

### III. Government's Motion for Discovery (Dkt. 22)

The Government requests discovery pursuant to Federal Rules of Criminal Procedure 16(b), 12.1, 12.2, 12.3 and 26.2. (Dkt. 22.) Mr. Paley did not object to the Government's discovery requests. Therefore, the Court grants the Government's motion and Mr. Paley shall provide discovery to the extent required by the applicable Rules and the Court's Pretrial Scheduling Order. (Dkt. 21.) With respect to expert discovery pursuant to Rules 16, as the Court previously ordered (Dkt 21), the following deadlines shall remain the same: (1) initial expert disclosures are due 28 days prior to trial, and (2) rebuttal expert disclosures are due 14 days prior to trial.

## CONCLUSION

Therefore, based on all the files records, and proceedings herein, it hereby **RECOMMENDED** that:

1.  Mr. Paley's Motion to Dismiss the Indictment (Dkt. 28) be **GRANTED**;

2. Mr. Paley's Motion to Suppress Statements (Dkt. 29) be **DENIED**;

3. Mr. Paley's Motion to Suppress Evidence (Dkt. 30) be **DENIED**;

**IT IS FURTHER ORDERED** that the Government's Motion for Discovery (Dkt. 22) is **GRANTED**.

Dated:  August 15, 2025             *s/Shannon G. Elkins*
                                    SHANNON G. ELKINS
                                    United States Magistrate Judge

**NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).