# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                                        Crim. No. 24-258 (JRT/SGE)

                Plaintiff,

v.                                  **MEMORANDUM OPINION AND ORDER**
                                   **ADOPTING IN PART AND REJECTING IN**

BENJAMIN PALEY,             **PART REPORT AND RECOMMENDATION**

                Defendant.

---

Lisa D. Kirkpatrick & Matthew S. Ebert, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; Bryce Rosenbower & Christen Gallagher, **DEPARTMENT OF JUSTICE, CRIMINAL DIVISION, COMPUTER CRIME AND INTELLECTUAL PROPERTY SECTION**, 1301 New York Avenue Northwest, Suite 600, Washington, D.C. 20005, for Plaintiff.

Andrew S. Birrell & Ian S. Birrell, **BIRRELL LAW FIRM, PLLC**, 333 South Seventh Street, Suite 2350, Minneapolis, MN 55402, for Defendant.

Defendant Benjamin Paley faces one count of Conspiracy to Commit Access Device Fraud under 18 U.S.C. §§ 317 and 1029(a)(1) and three counts of Access Device Fraud under 18 U.S.C. § 1029(a)(1) and (c)(1)(a)(i). The Indictment alleges that Paley and his coconspirators created and sold counterfeit license keys to customers that allowed such customers to access additional features of their Brocade network switch[1] without paying

---

[1] Brocade Communications Systems was a global technology company that specialized in storage networking products. It is now a subsidiary of Broadcom Inc. Brocade switches were networking hardware that allowed multiple devices to connect to a computer network.

Brocade.  Paley filed a (1) Motion to Dismiss Indictment for Failure to State an Offense, (2) Motion to Suppress Statements, and (3) Motion to Suppress Evidence Obtained by Search and Seizure.  On August 15, 2025, United States Magistrate Judge Shannon G. Elkins issued an Order and Report and Recommendation ("R&R") recommending that the Court grant Paley's motion to dismiss the Indictment, deny Paley's motion to suppress statements, and deny Paley's motion suppress evidence.  The Government timely objected.  After de novo review, the Court will overrule the Government's objections, adopt in part and reject in part the R&R,[2] dismiss the Indictment for failure to state an offense, and deny Paley's motions to suppress statements and evidence obtained by search and seizure as moot.

## BACKGROUND

### I.    FACTS

Brocade Communication Systems, Inc. ("Brocade") manufactured and sold computer networking products, including a product called "Brocade Switches." (Indictment ¶ 4, Sept. 25, 2024, Docket No. 1.)  The switch enabled multiple devices to connect to a computer network.  (*Id.*)  Each switch included a set number of ports that connected workstation devices to the network.  (July 18, 2025 Evid. Hr'g Tr. ("Tr.") at 11–12, Aug. 7, 2025, Docket No. 61.)  At the time of purchase, the switches included standard

---

[2] Because the Court will dismiss the Indictment for failure to state an offense, the Defendant's motions to suppress are moot.  The Court will therefore reject the R&R only to the extent it addresses Defendant's motions to suppress.

features.  (*Id.*)  For example, all switches had 24 ports, but only 8 ports were functional immediately.  (*Id*. at 11.)  To unlock extra features—like adding ports for more device connections—a switch owner needed to purchase a license key.  (*Id*. at 12, 14–16.)  A "license key" was a "long string of alphanumeric complex code" that was unique to each switch.  (*Id*. at 15.)  That is, a license key generated for a switch would only work on that switch, and additional features could not be accessed without a license key.  (*Id.* at 15–16, 29.)

To legitimately obtain additional switch functionality, a customer completed six steps.  First, the customer logged on to Brocade's[3] online license portal and created a "MyBrocade account."  (*Id.* at 17, 20; *see also* Gov't Dem. Exs. 1–6;[4] Gov't Supp. Mem. at 9–13, Apr. 28, 2025, Docket No. 43.)  Second, the customer entered the switch's serial number into the account.  (Tr. at 17–18.)  Third, the customer selected what level of functionality they needed, such as the number of extra ports to unlock.  (*Id.* at 18.)  Fourth, the customer purchased that functionality and received a transaction key, which is distinct from a license key.  (*Id.*; Gov't Dem. Ex. 2) Fifth, the customer provided the transaction key to Brocade (now Broadcom) by entering it into their MyBrocade account and received a license key.  (Tr. at 18, 20.)  Sixth, the customer plugged a computer into

---

[3] Although Brocade is now owned by Broadcom, the Court will, for simplicity, refer to Broadcom's systems and products as if they are Brocade's.

[4] The Government's demonstrative exhibits are not on the docket, but were introduced at the July 18, 2025 evidentiary hearing.  (*See* Docket No. 61.)

the switch and loaded the license key onto the switch.  (*Id.* at 18.)  As part of the process, Brocade logged all purchases in their own portal by tracking the switch owner's MyBrocade account alongside the switch's serial number.  (*Id*. at 20–21, 48.)  The switch itself also maintained a record of each license key that had been downloaded onto it.  (*Id.* at 30–31.)  Once a license key was purchased and installed on the switch, the additional functionality was available indefinitely, even if the switch was sold to a third party.  (*Id.* at 21.)

In addition to purchasing switches and license keys directly from Brocade, a legitimate secondary market existed for customers to purchase both new and used Brocade switches.  (*Id.* at 22.)  When a buyer acquired a switch through this resale market, they did not need a MyBrocade account to use any functionality already enabled on the device because once a license key had been entered, the added functionality remained permanently available.  (*Id.* at 21–22.)  Consequently, a MyBrocade account was not required if a validly purchased license key had already been installed on the switch nor was a MyBrocade account necessary if a customer purchased a counterfeit license key and used it to unlock additional features on the device.  (*Id.* at 48–53.)

But without a MyBrocade account record that matched the license keys on the switch, Brocade (now Broadcom) could not deliver updates to the switch.  (*Id*. at 31, 53.) Additionally, Brocade was unable to track which license keys had been uploaded to each switch without a corresponding MyBrocade account that was linked to all the license keys

-4-

on the switch. (*Id.*) Because counterfeit license keys could be installed without ever creating a MyBrocade account or updating Brocade's portal, those counterfeit keys were not reflected in Brocade's records.[5] (*Id.* at 50–53.) Similarly, Brocade's system showed no corresponding transaction keys because such transactions occurred outside of Brocade's channels (e.g., eBay). (*Id.* at 53.) In sum, the sellers and buyers of counterfeit license keys never had to interface with a MyBrocade account. (*Id.* at 54.)

The Government alleges that Benjamin Paley conspired with Wade Huber, David Rosenblatt, and others to create counterfeit license keys and sell them to third parties. (Indictment ¶ 10.)

## II.    PROCEDURAL HISTORY

Paley was indicted on September 25, 2024, and charged with one count of Conspiracy to Commit Access Device Fraud in violation of 18 U.S.C. §§ 371 and 1029(a)(1), and three counts of Access Device Fraud in violation of 18 U.S.C. § 1029(a)(1) and (c)(1)(a)(i). (*Id.* ¶¶ 11–20.) On January 24, 2025, Paley moved to dismiss the Indictment under Fed. R. Crim. P. 12(b)(3)(B)(v) for failure to state an offense. (Mot. Dismiss Indictment at 1, Jan. 24, 2025, Docket No. 28.) That same day, Paley moved to suppress

---

[5] Indeed, the alleged counterfeit license keys here were uncovered only after one of Brocade's customers, a German company, gave Brocade the license key and switch serial number, which Brocade checked against its portal and concluded that it did not issue a license key for that switch. (Tr. at 7.) The customer complaint then prompted Brocade to conduct its own internal investigation. (*Id.*)

statements made before the indictment as well as evidence seized from Defendant's home and office under certain search warrants.[6] (Mot. Suppress Statements, Jan. 24, 2025, Docket No. 29; Mot. Suppress Evid., Jan. 24, 2025, Docket No. 30.)

On April 14, 2025, the Magistrate Judge held a motion hearing, and after reviewing the parties' submissions, the Magistrate Judge determined that a more fulsome record was needed to decide Paley's motion to dismiss and reopened the Pretrial Motions Hearing. (Order, May 14, 2025, Docket No. 45.)

On July 18, 2025, the Magistrate Judge held an evidentiary hearing on the parties' motions.[7] (*See* Min. Entry, July 18, 2025, Docket No. 57.) On August 15, 2025, the

---

[6] The R&R details the facts underlying Defendant's motion to suppress statements and motion to suppress evidence obtained by search and seizure. *See United States v. Paley*, Crim. No. 24-258, 2025 WL 2374698, at *2 (D. Minn. Aug. 15, 2025). Because the Court will dismiss the Indictment and deny Defendant's motions to suppress as moot, the Court will not repeat the facts relating to those motions here.

[7] At the evidentiary hearing, FBI Special Agent Richard Frank testified, and the Court received the Government's Demonstrative Exhibits 1–6 and Exhibit 1:

Demonstrative Exhibit 1 is a simplistic illustration of a common workstation that connects to and utilizes a switch. Demonstrative Exhibit 2 is an illustration of how a legitimate license key is purchased. Demonstrative Exhibit 3 is screenshot of a prompt display that generates when a user logs onto a switch. Demonstrative Exhibit 4 is a screenshot of a command typed into a switch to show what license keys have already been installed. Demonstrative Exhibit 5 is a screenshot of a command typed into a switch to add a license. Demonstrative Exhibit 6 is a screenshot of a command typed into a switch to show the license that was recently installed. Government's Exhibit 1 is a Brocade document provided to customers with instructions for installing a license key to a switch.

*United States v. Paley*, 2025 WL 2374698, at *1.

Magistrate Judge issued an Order and R&R granting the Government's Motion for

Discovery and recommending that the Court grant Paley's Motion to Dismiss and deny

Paley's Motions to Suppress.  *United States v. Paley*, Crim. No. 24-258, 2025 WL 2374698

(D. Minn. Aug. 15, 2025).  The Government timely objected to the R&R.  (Gov't's Obj. to

R&R, ("Gov't's Objs."), Sept. 29, 2025, Docket No. 72.)

## DISCUSSION

### I.    STANDARD OF REVIEW

After a magistrate judge issues an R&R, "[a] party may file and serve specific

written objections to a magistrate judge's proposed findings and recommendations . . . ."

D. Minn. LR 72.2(b)(1).  "The objections should specify the portions of the magistrate

judge's report and recommendation to which objections are made and provide a basis for

those objections."  *Mayer v. Walvatne*, Civ. No. 07–1958, 2008 WL 4527774, at *2 (D.

Minn. Sept. 28, 2008).  For dispositive motions, the Court reviews de novo "properly

objected to" portions of an R&R.[8]  D. Minn. LR 72.2(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C);

Fed. R. Crim. P. 59(c).

--------

[8] In the civil context, "[o]bjections which are not specific but merely repeat arguments
presented to and considered by a magistrate judge are not entitled to de novo review, but rather
are reviewed for clear error."  *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017
(D. Minn. 2015).  It is unclear whether this rule applies in the criminal context.  *See United States
v. Chopra*, No. 19-305, 2021 WL 347415, at *1 (D. Minn. Feb. 2, 2021).  Because the Eighth Circuit
has not weighed in on the proper standard of review and because the Government's objections
fail under either standard, the Court will review the R&R de novo.

## II.   ANALYSIS

Because Paley's motions to dismiss and suppress are dispositive, the Court will review the Magistrate Judge's determinations de novo.  *See* D. Minn. LR 72.1(a)(3)(A), 72.2(b)(3).  The Government raises three objections to the R&R's determination that Paley's Motion to Dismiss should be granted.  First, the Government argues that the Indictment is sufficient and properly states an offense.  Second, the Government asserts that the R&R improperly concluded that whether a license key constituted an access device was ripe for pretrial determination.  Third, even if the issue is ripe, the Government argues that it demonstrated sufficient probable cause that Brocade license keys meet the definition of an "access device" under 18 U.S.C. § 1029(e)(1).  The Court will first address the second objection, and then the Court will address first and third objections together because they are related.

### A.   Ripeness

The Government asserts that the issue of whether a license key constituted an access device is not ripe for pretrial determination, arguing that the "question of whether a license key is an access device is not a purely legal issue," but a question for the jury. (Gov't's Objs. at 8.)

Under Federal Rule of Criminal Procedure 12(b)(1), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  The district court may therefore decide a pretrial motion "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in

determining the validity of the defense." *United States v. Baxter*, 127 F.4th 1087, 1090 (8th Cir. 2025) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)). "[T]he mere existence of factual issues in a pretrial motion does not preclude a pretrial ruling on the motion." *Id.* (citing Fed. R. Crim. P. 12(d)). Under Rule 12, the court may make factual findings, but it may not do so "when an issue is 'inevitably bound up with evidence about the alleged offense itself.'" *Id.* (quoting *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016). The district court may also resolve a case pretrial if "the relevant factual evidence is 'undisputed in the sense that it is *agreed* to by the parties,'" or the court "can decide the legal issues presented without making any factual findings" related to the alleged offense. *Id.* at 1091.

The Court concludes that the question of whether a Brocade license key satisfies the statutory definition of an "access device" is ripe for pretrial determination for three reasons. First, the parties do not appear to disagree about how the license key technology works, and thus the evidence is "undisputed in the sense that it is *agreed* to by the parties." *See id.* (quoting *United States v. Pope*, 613 F.3d 1255, 1261 (10th Cir. 2010) (Gorsuch, J.)). Indeed, Paley agreed that the Court could rely on the Government's description of the license key technology presented in the Indictment as well as the Government's submissions.[9]

---

[9] (Def.'s Supp. Mem. at 7–8, May 5, 2025, Docket No. 44; *see also* Gov't's Supp. Mem. at 9–13, Apr. 28, 2025, Docket No. 43; Def.'s Resp. to Gov't's Objs. at 7, Oct. 13, 2025, Docket No. 73.)

Second, the issue here is not "inevitably bound up with evidence about the alleged offense itself." *See Baxter*, 127 F.4th at 1090. That is, determining whether a license key qualifies as an "access device" does not require the Court to examine the "facts surrounding the commission of the alleged offense." *See Turner*, 842 F.3d at 605 (quoting *Covington*, 395 U.S. at 60). Instead, the Court need only interpret the meaning of "access device" under 18 U.S.C. § 1029(e)(1). This determination does not depend on any factual findings relating to whether the Defendant acted with fraudulent intent or whether he produced, used, or trafficked access devices. *See id.* § 1029(a)(1). Because this issue is "not inevitably bound up with evidence about the alleged offense itself," the Magistrate Judge was allowed to make factual findings on the license key technology and make a pretrial determination. *See Baxter*, 127 F.4th at 1090.

Third, the question of whether the license key constitutes an "access device" may be decided by the Court and is not necessarily a question of fact for the jury. *See, e.g.*, *United States v. Brady*, 820 F. Supp. 1346, 1358–59 (D. Utah), *aff'd*, 13 F.3d 334 (10th Cir. 1993); *United States v. Bruce*, 531 F. Supp. 2d 983, 989 (N.D. Ill. 2008); *United States v. Jackson*, 484 F. Supp. 2d 572, 576 (W.D. Tex. 2006). Because the Court finds that Rule 12 and the *Turner/Baxter* requirements are satisfied and that the Magistrate Judge properly resolved the matter at the pretrial stage, the Court will overrule the Government's second objection that the R&R improperly concluded that whether a license key constituted an access device was ripe for pretrial determination.

**B.     Motion to Dismiss Indictment for Failure to State an Offense**

The Government next objects to the R&R, arguing that the Indictment is sufficient, that the Indictment properly states an offense, and that the Government has shown sufficient probable cause that license key constitutes an "access device" under 18 U.S.C. § 1029(e)(1).

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). A defendant can move to dismiss an indictment if it fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). "An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Carter*, 270 F.3d 731, 736 (8th Cir. 2001). "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." *United States v. Fleming*, 8 F.3d 1264, 1265 (8th Cir. 1993).

After considering the plain text of 18 U.S.C. § 1029(e)(1) and case law interpreting such text, the Court concludes that Indictment fails to state an offense because Brocade license keys do not access an account. The Court will therefore overrule the Government's first and third objections.

### 1.    Statutory Interpretation

Paley was indicted on charges under 18 U.S.C. § 1029(a)(1), which provides that: "Whoever—knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices; . . . shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section." An "access device" is defined as:

> any card, plate, **code**, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, **or other means of account access** that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

18 U.S.C. § 1029(e)(1) (emphasis added). A counterfeit access device is defined as "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." *Id.* § 1029(e)(2). The Government contends that the license key is an access device, and Paley contends that it is not.

To begin with, it is undisputed that the license key is a "code" under § 1029(e)(1),[10] but the question remains: must that "code" also be a "means of account access"? The

---

[10] (Mot. Hr'g Tr. at 10, July 30, 2025, Docket No. 60.)

-12-

Court concludes that it must.[11]   The series-qualifier canon is instructive.   Under that canon, "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a modifier at the end of the list normally applies to the entire series." *GEICO Gen. Ins. Co v. M.O.*, 109 F.4th 1125, 1130 (8th Cir. 2024).[12]   The phrase "other means of account access" appears at the end of a series of listed nouns, 18 U.S.C. § 1029(e)(1), and the phrase is "applicable as much to the first and other words as to the last," *Paroline v. United States*, 572 U.S. 434, 447 (2014).   Therefore, the phrase "other means of account access" will be construed to apply to all of the nouns listed in § 1029(e)(1), including "code."

Accordingly, Paley's motion to dismiss hinges on whether the license key (i.e., a code) is a "means of account access" as the term is used in § 1029(e)(1).

---

[11] The Magistrate Judge concluded that the code must be a means of account access, and the Government objected to this conclusion.  (Gov't's Objs. at 14 n.16.)  For the reasons discussed in this section, the Court will overrule the Government's objection.

[12] The Magistrate Judge reached the same conclusion the Court reaches here: The phrase "or other means of account access" indicates that "means of account access" applies to the preceding nouns listed in 18 U.S.C. § 1029(e)(1).  The Magistrate Judge, however, cited the "last antecedent rule."  *Paley*, 2025 WL 2374698, at *3 n.6.  Under the last antecedent rule, a "limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Lockhart v. United States*, 577 U.S. 347 (2016) (citation omitted).  As courts have recognized, the last antecedent rule and the series-qualifier canon operate as "competing canons."  *See, e.g.*, *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022).  For clarity, although the Magistrate Judge referenced the last antecedent rule, she appears to have applied the series-qualifier canon.

### 2. Case Law Survey

Having concluded that the license key must be a "means of account access" to qualify as an access device, the Court must construe the meaning of "account" because a device can be a "means of account access" only if it accesses an "account." Section 1029(e) does not define "account." No party cites, and the Court has not located, a single reported case deciding whether a license key of this kind is an "access device" under § 1029. But as detailed by the Magistrate Judge, several courts have discussed the meaning of an "access device," and the Court finds them instructive. The Court will summarize several of these cases, and then the Court will analyze how those cases shed light on how § 1029 applies to the Brocade license keys here.

First, in *United States v. Brewer*, the defendant obtained several unassigned long distance telephone access codes by repeatedly calling a toll-free number and testing different number combinations until he discovered valid—but unassigned—long distance access codes. 835 F.2d 550, 551 (5th Cir. 1987). The codes enabled users to placed long-distance calls without paying for them. *See id.* The Fifth Circuit held that this conduct fell within the reach of 18 U.S.C. § 1029 based on a plain language of the statute and its legislative history. *Id.* at 553–54.

A few years later, the Tenth Circuit in *United States v. McNutt* held that a cloned satellite television descrambling device, which enabled satellite television viewers to receive broadcasts without paying the required subscription fees did not constitute an "access device." 908 F.2d 561, 563 (10th Cir. 1990). The Tenth Circuit acknowledged that

§ 1029 was meant to alleviate "the growing problem in counterfeit credit cards and unauthorized use of account numbers or access codes to banking system accounts . . . ." *Id.* (citation omitted). The court also rejected the Government's argument that the descramblers were a "means of account access" because legitimate viewers that paid subscription fees were giving the viewers that used cloned descramblers a "free ride." *Id.* at 563. The court reasoned that the "government ha[d] mistaken economic losses for actual monetary losses resulting from discrete transactions reflected in the company's accounting records." *Id.* In other words, the cloned descramblers were not access devices because they did not "debit legitimate subscribers' accounts" and their unauthorized use generated no additional charges. *Id.* at 563–64. Finally, the Court concluded that "nothing in the plain wording, legislative history or judicial interpretation of § 1029" shows "that Congress intended that statute to apply to anything other than direct accounting losses." *Id.* at 564.

The Eighth Circuit first interpreted § 1029 in *United States v. Taylor*, 945 F.2d 1050 (8th Cir. 1991). In *Taylor*, the defendant discovered a method for ascertaining valid, but unassigned, American Express card numbers, which enabled him to fraudulently charge the valid, but unassigned, credit card numbers. *Id.* at 1051. He was convicted of access device fraud. *Id.* at 1050 The Eighth Circuit affirmed, relying on *Brewer* and concluding that "[t]he unauthorized use of an account number covering a valid, but unassigned account" constituted access device fraud under § 1029. *Id.* at 1051. In *Taylor*, the

defendant argued that he did not use an "access device" because an account did not exist, and therefore he could not access an account.  *Id.* The Eighth Circuit rejected this argument without much explanation, finding that it "cut[] too thinly" and that § 1029 applied to the defendant's conduct.  *Id.*

In *United States v. Brady*, 13 F.3d 334 (10th Cir. 1993), the Tenth Circuit revisited its interpretation of "access device."  There, the defendant used "tumbling" cell phones to free ride on the cellular telephone service.[13]  *Id.* at 336.  The Tenth Circuit concluded that tumbling cell phones were not a "means of account access" because, similar to *McNutt*, the practice did "not debit a legitimate subscriber's account, nor d[id] it trigger the creation and maintenance of a formal record of credits and debits."  *Id.* at 339.  The court found that there was no support for the conclusion "§ 1029 applies to anything less than access to an identifiable account for which a record is created and maintained."  *Id.*  The Court distinguished *Brewer* and *Taylor* because in those cases, each defendant accessed an identifiable, valid account—even though they were unassigned; whereas in *Brady*, the defendant did not access a valid account—assigned or unassigned.  *Id.*  Finally, the Court reiterated that the "direct accounting losses" are required under § 1029 and "that to hold

_____

[13] Tumbling involves modifying the chip that holds the mobile identification number (MIN) and the electronic serial number (ESN) of a cell phone to allow the user to change (or tumble) the MIN/ESN combination to make free phone calls until the invalid combination is detected and the phone is blocked from further calls.  *Brady*, 13 F.3d at 336.

otherwise would turn § 1029 into a general theft statute applicable whenever a company can document a loss through fraud."  *Id.* at 340.

The next year, the Ninth Circuit construed the meaning of "access device" in *Bailey v. United States*, 41 F.3d 413 (9th Cir. 1994), another case involving tumbling cell phones, and the court took a different approach.  Unlike the Tenth Circuit in *Brady*, the Ninth Circuit in *Bailey* held that the practice of "tumbling the ESN" was a "means of account access" and thus within the purview of 18 U.S.C. § 1029.  *Id.* at 415–16, 419.  In doing so, the court defined an "account" differently, holding that "an account is a contractual relationship that makes possible the provision of goods, services, or money based on payment, or the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record."  *Id.* at 417.  The court found it to be immaterial that defendant's tumbling phone did not access a valid customer account because there was a "valid, preexisting 'account' between the local and distant carriers."  *Id.* at 418.  The court reasoned that § 1029 does not suggest that protection against unauthorized access is limited solely to accounts held by end users.  *Id.*  Instead, Ninth Circuit emphasized that "[i]t matters only that the user of the access device be able to obtain goods or services from which he would otherwise be excluded."[14]  *Id.*

---

[14] The Ninth Circuit in *Bailey* distinguished *McNutt* but made "no comment on the propriety of the holding of *McNutt*."  *Bailey*, 41 F.3d at 419.  That said, the Court expressly disagreed with the Tenth Circuit's decision in *Brady*.

In *United States v. Ashe*, the Sixth Circuit adopted the reasoning in *Bailey* and rejected *Brady*'s, concluding that the "invasion of an identifiable customer's account is not a necessary element of proof to support a conviction under" 18 U.S.C. § 1029.  47 F.3d 770, 774 (6th Cir. 1995).  In *Ashe*, the defendant was convicted of trafficking "tumbling" cell phones.  *Id.* at 771.  As in *Bailey*, the cell phones did not access a customer account, but it did access accounts held between carriers.[15]  *Id.* at 774.  The Sixth Circuit held that the defendant's conduct violated 18 U.S.C. § 1029, concluding that the tumbling cell phone is an access device that is "capable of accessing cellular telephone carrier accounts by transmitting counterfeit MIN and ESN signals that permit illicit 'roamers' to fraudulently obtain free air time."  *Id.*  The court also distinguished *McNutt* because in that case, the service provider only suffered lost revenues, not any "out-of-pocket financial loss"; whereas in *Ashe*, the service provider suffered out-of-pocket losses that "were recorded as debits to fictitious accounts identified by counterfeit account numbers."  *Id.* at 774 n.10.

Finally, the Second Circuit adopted the Ninth Circuit's approach in *Bailey*.  In *United States v. Abozid*, the defendant owned an Airline Reporting Corporation (ARC)-accredited

---

[15] Roaming calls are handled by the foreign carrier—the one the caller does *not* have an account with.  *Ashe*, 47 F.3d at 773.  The foreign carrier is later reimbursed by the caller's home carrier, who then bills the customer for the roaming charges.  *Id.* at 774.  Because the tumbling phone supplied the foreign carrier with what appeared to be a valid home-carrier identification number, the call went through.  *Id.*  But since the account number was fictitious, the home carrier could not trace or bill the call, leaving the home carrier responsible for the charges.  *Id.*

travel agency, which received a unique ARC number that allowed the agency to secure airline tickets on credit; each agency maintained a bank account accessible to ARC and was required to deposit customer payments into it. 257 F.3d 191, 193–94 (2d. Cir. 2001). The defendant exploited this system by generating large numbers of valid airline tickets without customer orders, selling them for cash at a discount, keeping the money, and failing to remit payments to the airlines—leaving the airlines with nearly $1 million in losses. *Id.* at 193. On appeal, the defendant argued that a validated airline ticket, which contained the ARC account number and other information, was not an "access device" under § 1029(e)(1). *Id.* at 194. The Second Circuit disagreed, holding that the "credit relationship" between ARC and the travel agency satisfied the statute's "account access" requirement. *Id.* at 195. The court acknowledged that the "ARC account number trigger[ed] an obligation on the travel agency's bank account to the airline that will, if the amount owed exceeds the sums in the account and security, lead to an extension of credit by the airline." *Id.* The court relied on Ninth Circuit's definition of "account" in *Bailey* and acknowledged—but did not resolve—the tension between *Bailey* and *McNutt*, explaining that the tickets in *Abozid* clearly accessed a credit account. *Id.* at 195–97.

In sum, the plain text of § 1029(e) requires, and the case law above confirms, that the Brocade license keys must be a "means of account access" to qualify as an access device. Section 1029(e) does not define "account." Although the Court is bound by

*Taylor*, that case alone does not resolve whether the license keys access an account. The Court will therefore rely on other courts' decisions as persuasive authority.

### 3.    Application

Paley contends that the Indictment is insufficient to state an offense because the Brocade license key does not access an account, and therefore such key is not an "access device." The Government argues that the license key is an "access device" because it "is a code that grants access to valuable advanced capabilities not otherwise available to a user without a MyBrocade account." (Gov't's Objs. at 15.) In essence, the Government focuses on whether license key could be used to "obtain[] something of value to which he or she would not otherwise be entitled." (*Id.* at 16.) The Magistrate Judge concluded that the Brocade license key was not an "access device" because it did not access an account. *Paley*, 2025 WL 2374698, at *7–8. The Court agrees with the Magistrate Judge for three reasons.

First, the fact that the license keys sold by Paley unlocked the network switch's advanced capabilities (e.g., additional ports) does not mean that those keys accessed an "account." In fact, the Indictment and the record reflect that the purpose of the counterfeit license keys was *to avoid* accessing an account (i.e., MyBrocade account). To legitimately enable the network switch's advanced capabilities, users had to follow specific steps: (1) create a MyBrocade account; (2) enter the switch's serial number; (3) select and purchase the desired level of functionality; (4) receive a transaction key and enter it into the MyBrocade account; (5) download the license key from the Brocade

license portal; and (6) enter license key into the switch. Once the license key was installed, the enhanced features remained active indefinitely. This process created a problem for Brocade. Although Brocade could track legitimate purchases through the user's MyBrocade account, it could not immediately detect counterfeit licenses because the license keys resided only on the network switch itself and counterfeit license keys could be installed without ever interacting with the account portal.[16] (Tr. at 52–53 (explaining that neither the license key nor the transaction key would be referenced in the user's account portal if the transaction did not involve Brocade).) This problem is evidenced by the fact that Brocade discovered counterfeit license keys only after a customer contacted technical support and the company determined—by checking the account portal—that the counterfeit keys did not correspond to any legitimate purchase.[17] (See Tr. at 7, 41, 52–54.)

---

[16] The Government contends that the Magistrate Judge erroneously held that the license key was not an access device because it was difficult to detect the fraud. (Gov't's Objs. at 20.) The Court rejects this argument. It is true that the "difficulty of detection of a fraud does not make it less fraudulent." (Id.) But the Magistrate Judge did not base her conclusion on the difficulty of detection. (R&R at 14.) Instead, the Magistrate Judge emphasized that the fraud was hard to detect precisely because no account was accessed. In other words, if an account (e.g., MyBrocade account) was accessed, Brocade would likely have been able to detect the fraud sooner. The Court therefore rejects the Government's argument.

[17] The Government seemingly admitted that no account was accessed. (Gov't's Supp. Mem. at 22, Apr. 28, 2025, Docket No. 43 ("Installing a counterfeit license key allowed the user to obtain the benefit of the additional capabilities without the corresponding account record and payment to Broadcom.").)

The Government relies on *Taylor* and *Brewer* to support the proposition that the Brocade license key is an access device because the key accesses a thing of value—the network switch's additional capabilities. These cases are distinguishable because in those cases, actual accounts were accessed in addition to obtaining a thing of value. In *Taylor*, the defendant made charges to valid but unassigned American Express card numbers. 945 F.2d at 1051. In *Brewer*, the defendant misappropriated valid but unassigned long distance telephone access codes to obtain unauthorized services. 835 F.2d at 551. Here, by contrast, the counterfeit license keys are shown only by the absence of an entry in the account—not by a debit or credit to an account. The license key therefore neither alters "a formal record of debits and credits," *McNutt* 908 F.2d at 563 (citation omitted), "trigger[s] the creation and maintenance of a formal record of credits and debits," *Brady* 13 F.3d at 339, nor affects a "contractual relationship" that is "described by the entry of credits and debits," *Bailey*, 41 F.3d at 417.[18] Nor does the license key access a credit account as contemplated by the Second Circuit in *Abozid*. *See Abozid*, 257 F.3d at 195–96.

Recognizing that the user who installed a counterfeit license need not interface with a MyBrocade account, the Government attempts to avoid this problem by arguing that the switch itself is an "account" because the switch records the installation of each

---

[18] Although courts in *McNutt* and *Bailey* defined "account" differently, the Court need not resolve the disagreement to dispose of the Government's objections because the Brocade license keys satisfy neither definition.

license key.  (Gov't's Objs. at 18–19.)  The Court concludes that this argument stretches the definition of "access device" under 18 U.S.C. § 1029 too far.  In support of this argument, the Government cites *United States v. Jackson*, but in that case, the court **dismissed** the indictment because airline tickets at issue were not "access devices."  484 F. Supp. 2d at 576.  In doing so, the court emphasized that "while obtaining a thing of value is part of the offense, the thing of value must be obtained by accessing an account with an 'access device.'"  *Id.*  Although the license keys unlocked advanced capabilities, that fact alone does not transform the switch into an "account." The Court finds no basis for treating it as such, and the Government cites no authority to the contrary.

Second, Brocade suffered no out-of-pocket losses—only lost future revenues. Reading *McNutt*, *Bailey*, and *Ashe* together, economic losses resulting from a loss of revenue are insufficient.  In *McNutt*, the Tenth Circuit held that cloned satellite television descrambling devices did not access an account because they caused no "direct accounting losses," only lost revenue.  *McNutt*, 908 F.2d at 563–64.  In *Bailey*, the Ninth Circuit held that 18 U.S.C. § 1029 covered tumbling cell phones because even though the cell phone did not correspond to customer accounts, the devices impacted the account between the local and distant carriers because the former expected reimbursement from the latter.  41 F.3d at 418.  Likewise, in *Ashe*, the Second Circuit distinguished *McNutt* and held that 18 U.S.C. § 1029 applied to tumbling cell phones because they caused the service provider to incur actual out-of-pocket losses: the home carrier had to reimburse the

foreign carrier for roaming charges, and because the account number was fictitious, the home carrier could not recover the reimbursement payments from the caller. 47 F.3d at 774 n.10. Unlike *McNutt, Bailey*, and *Ashe*, neither Brocade nor any customer account suffered actual out-of-pocket losses. Brocade suffered only lost revenue, which is insufficient.[19]

Third, if the Court were to conclude that the license keys satisfy the definition of "access device" under § 1029(e)(1), the Court would expand the statute to cover conduct beyond what Congress envisioned. When the statute was passed, "Congress was focused upon the fraudulent use of [access] devices in connection with credit transactions . . . ." *United States v. Blackmon*, 839 F.2d 900, 914 (2d Cir. 1988). Congress recognized "a growing problem in counterfeit credit cards and unauthorized use of account numbers or access codes to banking system accounts[.]" H.R. Rep. No. 98-894, at 4 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3689, 3689. Of course, the term "access device" was intended to be "broad enough to encompass technological advances," *Bailey*, 41 F.3d at

---

[19] In *Brady*, the Tenth Circuit, relying on *McNutt*, held that tumbling cell phones were not a "means of account access" and thus not covered by 18 U.S.C. § 1029. *Brady*, 13 F.3d at 340. *Bailey* and *Ashe* expressly disagreed with the Tenth Circuit's ruling in *Brady* because the home carrier must reimburse the foreign carrier for roaming charges and thus the home carrier suffers an out-of-pocket loss. *See Ashe*, 47 F.3d at 774 (rejecting *Brady* because "preexisting agreements and practices within the inter-telephone carrier network require a MIN-identified home carrier to reimburse a foreign carrier" for roaming charges); *Bailey*, 41 F.3d at 418–19. The *Brady* court either ignored this fact or did not find it material to its analysis. No matter which court has the better argument, the Court need not pick a side because the Indictment and the record demonstrate that Brocade did not suffer any out-of-pocket losses.

417, but the Court is not persuaded that the statute should be stretched to encompass the license keys at issue, which merely enhance a physical device's functionality and do so without accessing an account.[20]

Because the license keys are not a means of account access, the Government has failed to allege an essential element of § 1029(a)(1).  The Court will therefore dismiss the Indictment for failure to state an offense.[21]

## CONCLUSION

The Court concludes that the question of whether a Brocade license key satisfied the statutory definition of an "access device" is ripe for pretrial determination because the requirements under Rule 12 and *Turner/Baxter* are met.  Paley was indicted on charges under 18 U.S.C. § 1029(a)(1).  To sufficiently allege violations of § 1029(a)(1), the Government must allege an "access device" as defined by § 1029(e)(1).  Such a device must be a "means of account access."  Because the license keys alleged in the Indictment

---

[20] *See* S. Rep. No. 98-368, at 10 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3647, 3656; H.R. Rep. No. 98-894, at 19 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3689, 3705.

[21] The Government's first objection is that Magistrate Judge erred by "concluding there is a requirement that a specific account be pled."  (Gov't's Objs. at 6.)  That, however, was not the Magistrate Judge's rationale for recommending dismissal.  Rather, the Magistrate Judge held that "the Government has failed to allege an essential element of § 1029(a)(1), because the purported access device—counterfeit license key—is not a means of account access as required by § 1029(e)(1)."  (R&R at 16.)  The Magistrate Judge did not impose a heightened pleading standard but recommended dismissal because the Indictment failed to allege an access device.  Indeed, other courts have dismissed the indictment where the factual allegations underlying the indictment failed to sufficiently allege an access device.  *See, e.g.*, *Brady*, 820 F. Supp. at 1358–59, *aff'd*, 13 F.3d 334 (10ᵗʰ Cir. 1993); *Bruce*, 531 F. Supp. 2d at 989; *Jackson*, 484 F. Supp. 2d at 576.

do not access an "account," the Indictment fails to state an offense and will be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v).[22]

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Government's Objections to the Report and Recommendation [Docket No. 72] are **OVERRULED.**

2. The Report and Recommendation [Docket No. 62] is **ADOPTED in part and REJECTED in part**.

3. Defendant Paley's Motion to Dismiss the Indictment [Docket No. 28] is **GRANTED**.

4. Defendant Paley's Motion to Suppress Statements [Docket No. 29] is **DENIED as moot**.

5. Defendant Paley's Motion to Suppress Evidence [Docket No. 30] is **DENIED as moot**.

DATED: December 19, 2025
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

---

[22] Because the Court will dismiss the Indictment for failure to state an offense, Paley's motions to suppress statements (Docket No. 29) and evidence obtained by search and seizure (Docket No. 30) will be denied as moot. As a result, the Court rejects the Magistrate Judge's R&R on the suppression motions.